675 F.2d 151
 ILLINOIS PHYSICIANS UNION and Elsy Salazar, M.D.,
Plaintiffs-Appellants,
v.
Jeffrey MILLER, Director, Illinois Department of Public Aid
and Michael Tristano, Supervisor, Medical Audit
Section, Illinois Department of Public
Aid, Defendants-Appellees.
 No. 81-1048.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 8, 1982.
Decided April 13, 1982.
 
 Roger N. Gold, Baum, Sigman & Gold, Ltd., Chicago, Ill., for plaintiffs-appellants.
 James C. O'Connell, Sp. Asst. Atty. Gen., Welfare Lit., Ellen P. Brewin, Asst. Atty. Gen., Chicago, Ill., for defendants-appellees.
 Before PELL and BAUER, Circuit Judges, and MORGAN, District Judge.*
 BAUER, Circuit Judge.
 
 
 1
 Elsy Salazar and the Illinois Physicians Union brought this action challenging the procedures employed by the Illinois Department of Public Aid (Department) to audit physicians who are reimbursed for their medical services through the Illinois Medical Assistance Program. The district court upheld the audit procedures but found that the physicians' due process rights had been violated because the Department had not given the physicians adequate notice of the audit procedures or of their right to rebut the Department's findings based on these procedures. The Department was ordered to promulgate and publicize regulations notifying physicians of the Department's use of sampling and extrapolation and of their right to rebut the Department's findings. Salazar was given 120 days in which to present evidence challenging the recoupment claim or to pay the full $18,508.30.[1] We affirm.
 
 
 2
 Salazar has been a participating doctor in the Illinois Medical Assistance Program for many years. In July 1975 the Department conducted a routine audit of Salazar's records. Auditing a sample of 353 records randomly selected from a total of 1,302 records for the audit period, the Department determined that Salazar had been overpaid $5,018.00. The Department extrapolated the overpayment for the 353 cases to the total number of cases for which Salazar had been reimbursed and made a recoupment claim of $18,503.30.
 
 
 3
 Salazar challenged the claim and an administrative hearing was held to review her challenge. At the hearing the Department introduced evidence relating solely to the audited cases and the mathematical formula used to extrapolate the overpayments.[2] No evidence was offered, either by the Department or Salazar, relating to the unaudited cases. The Hearing Officer recommended that the Department recover the entire overpayment; the Director of the Department adopted this recommendation.
 
 
 4
 Salazar contends that the use of sampling and extrapolation is contrary to the fourteenth amendment and to state law. She asserts that due process requires that an agency's ruling conform to the substantive evidence and argues that, since there was no evidence introduced at the hearing with respect to the unaudited cases, the Department may not presume that any overpayments occurred or estimate the amounts of any alleged overpayments. Additionally, because the Department will not routinely conduct an audit of one hundred percent of the records merely because a physician challenges a recoupment claim, Salazar disputes the Department's assertion that physicians have the opportunity to rebut a finding of overpayment. She maintains that there are "so many onerous preconditions to granting a one hundred percent audit," appellant's br. at 33, that the right to rebut the Department's presumption of liability and estimate of damages does not exist in a meaningful way.
 
 
 5
 * Some knowledge of the statutes and regulations providing for subsidized medical services, as well as the Department's audit procedures, is essential to an analysis of the issues in this case. Pursuant to Title XIX of the Social Security Act, 42 U.S.C. § 1396, needy individuals are eligible to receive "necessary medical services" from physicians who are reimbursed through cooperative federal-state Medicaid programs. In order to receive the federal funds the states must submit a "State plan" for approval by the Secretary of Health and Human Services and assume responsibility for assuring that the Medicaid program is administered in compliance with the federal statute, 42 U.S.C. § 1396a. The state must adopt procedures to safeguard against fraud and abuse. 42 C.F.R. § 447.45(f)(2), § 456.23.
 
 
 6
 In accordance with the federal provisions, Illinois requires physicians participating in its Medicaid program to maintain detailed records of the nature and scope of the health care they provide to patients receiving assistance under the Illinois Public Aid Code, Ill.Rev.Stat. ch. 23, § 5-5. Physicians are paid periodically on the basis of the billing forms they submit to the Department. Post-payment audits are then conducted so that the Department can recoup any excess compensation paid because of improper billing practices. Department Rule 4.017 states that "(t)he Department's procedure for auditing providers may involve the use of sampling and extrapolation." Under Rules 9.51 and 9.55 physicians may rebut the Department's finding by presenting evidence to establish that the sample used by the Department is invalid or by conducting an audit of one hundred percent of the medical records for which payments were received.
 
 
 7
 The Department conducts its initial audit by examining the randomly selected records for discrepancies. Discrepancies exist when no medical records are available to verify the submitted bills or when a billing code has been misused. The sample audited in Salazar's case, representing twenty-seven percent of the total cases for the audited period, uncovered four types of discrepancies: (1) bills for which there were no available medical charts; (2) bills indicating that services had been provided for a patient on a particular day but which were not recorded on the patient's medical chart; (3) bills which did not accurately reflect the type of medical treatment rendered;[3] and (4) bills for services for which Salazar received payment but which had actually been rendered by another medical provider. The overpayment for these discrepancies were averaged and applied to the total universe of cases.
 
 
 8
 Salazar states that the issue is whether overpayments may be presumed. She asserts that the burden of proof on the issues of whether there have been overpayments and the amount of those overpayments rests on the Department and may not be shifted. Relying heavily on Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931), Daytona Beach General Hospital, Inc. v. Weinberger, 435 F.Supp. 891 (M.D.Fla.1977), and Florida Builders, Inc. v. Stephenson Tile, Inc., 167 So.2d 58 (Fla.App.1964), Salazar strenuously argues that due process requires that liability be proven in each individual case in which an overpayment is claimed and that the Department's audit and recoupment procedures are unconstitutional because they shift the burden of proof.
 
 
 9
 We disagree with Salazar's characterization of the issue. As we see it, the issue is not whether overpayments may be statistically presumed, but whether the state, in attempting to preserve its welfare monies, may place the burden on the physician to demonstrate that the Department's calculations are inaccurate. We begin our analysis by noting that this case does not involve an irrebuttable presumption[4] for the Department does not automatically presume liability. Rather, it conducts an initial audit on a substantial portion of the physician's records by examining each individual record in the sample. Thus, overpayments are actually proven with respect to the audited cases.
 
 
 10
 Section 1396a requires physicians to keep records necessary to fully disclose the extent of services rendered and to make such records available to state and federal governments as a condition of receiving Medicaid payments. 42 U.S.C. § 1396a(a)(27). Payment is made only after the billing forms are submitted evidencing the right to reimbursement. At all times the burden is on the physician to prove entitlement to welfare monies. Thus, the Department's presumption that the percentage of error in the total number of cases is the same as the percentage of error in the audited cases does not have the procedural effect of shifting any burden.
 
 
 11
 Although not cited by either party, we believe that Lavine v. Milne, 424 U.S. 577, 96 S.Ct. 1010, 47 L.Ed.2d 249 (1976), is analogous to the situation here and, thus, controls. In Lavine the Supreme Court upheld a New York statute which presumed that, in absence of evidence to the contrary, any applicant for welfare assistance who voluntarily terminated employment and applied for aid within seventy-five days of the termination did so to establish or increase the applicant's need for state welfare. The Court held that this provision carried with it no procedural consequence because "(d)espite the rebuttable presumption aura that the ... (language of the statute) ... radiates, it merely makes absolutely clear the fact that the applicant bears the burden of proof ...." 424 U.S. at 584, 96 S.Ct. at 1015. It noted that "(t)he only 'rebuttable presumption-if, indeed, it can be so called-at work here is the normal assumption that an applicant is not entitled to benefits unless and until he proves his eligibility." Id. The Lavine rationale is equally applicable in this case for, like the statute in Lavine, the sole purpose of the Department's procedure requiring the physicians to establish that all bills submitted are for covered services is to assure eligibility for state monies.
 
 
 12
 The Lavine rationale recently has been applied in a situation involving eligibility for Medicaid. Drogolewicz v. Quern, 74 Ill.App.3d 862, 30 Ill.Dec. 865, 393 N.E.2d 1212 (1st Dist. 1979), concerned a statutory presumption that a transfer of property for less than cash market value within five years of an application for Medicaid assistance was made with the intent to qualify or to increase the need for aid. The court held that the presumption did not violate due process because the applicant was given the opportunity to rebut the statutory presumption by demonstrating a lack of benefit-seeking motive in divestments of property for less than fair market value.
 
 
 13
 In concluding that the state may determine whether it or the individual must bear the burden of proof on the issue of eligibility, the Lavine Court specifically noted that decisions invalidating statutory presumptions for lack of a rational connection between the ultimate fact presumed and the facts actually placed in evidence had no application in a situation where no shifting of the burden takes place. 424 U.S. at 584-85 n.9, 96 S.Ct. at 1015-16 n.9. Thus, the issue here does not require a determination of whether there is a rational connection between the method of computing overpayments for the audited cases and the method of computing overpayments for the total number of cases. Moreover, assuming arguendo, that the burden has shifted, thereby requiring us to decide whether there is a rational connection between overpayments for the audited sample and overpayments for the total number of cases, we conclude that the rational connection does exist.
 
 
 14
 However, Salazar does not merely challenge the validity of the Department's calculations, but contends that any formula for sampling and extrapolation is improper per se. We cannot agree, for the use of statistical samples has been recognized as a valid basis for findings of fact in the context of Medicaid reimbursement. State of Georgia v. Califano, 446 F.Supp. 404 (N.D.Ga.1977). In State of Georgia, the court specifically considered, and rejected, the same argument Salazar raises here. It noted that the use of statistical samples to audit claims and arrive at a rebuttable initial decision was reasonable where the number of claims rendered a claim-by-claim review a practical impossibility. The court concluded that it was not unreasonable to place the burden on the challenging party to present evidence to rebut the statistical sample.
 
 
 15
 Salazar claims that State of Georgia is inapplicable because it involved a dispute between the State and the Department of Health, Education and Welfare rather than a dispute between the physician and the state. She contends that since a state cannot assert a right to constitutional due process protection, the issue of whether a recoupment judgment based on sampling violated due process was not involved in that case. We disagree. The distinctions between the parties in no way alters the correctness of the court's analysis of whether use of a statistical sample, as opposed to a claim-by-claim review, is arbitrary and capricious. The court's conclusion that extrapolation based on review of a relatively small sample is a valid audit technique in cases arising under the Social Security Act is applicable in this case.
 
 
 16
 Salazar assumes that extrapolation automatically penalizes the physician. She emphasizes that when misuse of a billing code results in an overpayment, the Department seeks to recoup the difference between the amount received for the improper code and the reduced amount the doctor would have received had the proper code been used, but that where misuse of a billing code results in an underpayment, the physician is not given credit, nor is the underpayment considered in the extrapolation calculations. Appellants' br. at 13-14.
 
 
 17
 We find nothing in this procedure, however, to suggest that extrapolation inherently works to the detriment of the physician. Sampling and extrapolation is no more likely to result in a situation where the physician will be required to return monies when there has been no overpayment than in a situation where the Department will not recoup the full amount overpaid. The audit procedures are not arbitrary, capricious or invidiously discriminatory.
 
 
 18
 Daytona Beach General Hospital, Inc. v. Weinberger, 435 F.Supp. 891 (M.D.Fla.1977) does not compel a contrary conclusion. In Daytona Beach a sample of less than ten percent was used to compute the amount of recoupment due the Department of Health, Education and Welfare for Medicare overpayments. The court concluded that a recoupment claim based on only ten percent of the total cases was a denial of due process. We do not read Daytona Beach to hold that the use of sampling and extrapolation always constitutes a denial of due process, no matter how representative the sample. However, to the extent that the decision can be read to invalidate all use of statistical sampling, we decline to adopt its rationale.
 
 
 19
 Further, neither Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931), nor Florida Builders, Inc. v. Stephenson Tile, Inc., 167 So.2d 58 (Fla.App.1964), supports Salazar's position. In Story Parchment Co. the issue was whether damages could be awarded in a Sherman Anti-Trust Act action where liability had been established but the exact amount of damages was unknown. The Supreme Court concluded that once it has been established that the petitioner had sustained some damage, it would be "a perversion of fundamental principles of justice to deny all relief to the injured person" merely because the damages were not susceptible of exact calculation. 282 U.S. at 563, 51 S.Ct. at 250. The Court held that, although it was improper to determine damages by mere speculation, it would be sufficient "if the evidence show(ed) the extent of the damages as a matter of just and reasonable inference, although the result be only proximate." Id. To the extent that Story Parchment has any relevance here, it supports the use of sampling and extrapolation.
 
 
 20
 Similarly, Florida Builders, Inc. is of no help to Salazar. Florida Builders, Inc. involved an action by a general contractor to recover damages for breach of a subcontract. The court refused to presume that all the subcontractor's work was defective on the basis of testimony relating to a portion of his work because: (1) defective workmanship in a limited number of instances did not raise the "inescapable and binding inference" that all his work was defective and (2) the trial court was not bound to accept as true the assumptions of plaintiff's witnesses as to the extent of damages, particularly when those assumptions were based on hearsay evidence acquired from third parties. 167 So.2d at 60. This private contract action has no application here.
 
 II
 
 21
 Having concluded that the use of sampling and extrapolation is proper provided there is an opportunity to rebut the initial determination of overpayment, we next consider whether the Department's procedures for challenging the determination satisfies due process. Salazar disputes the Department's assertion that a physician has the option of producing all the records as an alternative to reliance on sampling and extrapolation. She alleges that, under Department guidelines, a one hundred percent audit will not be conducted unless the physician presents compelling evidence of significant technical deficiencies in the sampling or audit procedures. Also, Salazar complains that onerous preconditions attach to the granting of a one hundred percent audit, such as requiring: (1) that the Department and the physician arrive at an agreement as to the recoupment claim in the audited sample before the Department will consider a request for a one hundred percent audit and (2) that the physician challenging the recoupment claim bear the costs of conducting the one hundred percent audit.
 
 
 22
 Citing Department Rule 9.55, Salazar alleges that only a one hundred percent audit may be introduced to rebut the Department's presumptions and maintains that, as a practical matter, such an audit would be impossible for the physician to conduct. Salazar contends that conducting a one hundred percent audit requires thorough knowledge of every type of Department rule and regulation and a subjective application of these rules and regulations to every record audited. For this reason, she concludes that not only would the audit "be practically impossible but the results would be meaningless," and, in all likelihood, "the Department ... (would not) ... ever consider a physician's interpretation of the Department's rules and regulations to have probative force ...." Appellants' br. at 37.
 
 
 23
 There is no merit to Salazar's contention that the Department procedures do not comport with due process. The process due varies with the circumstances and various factors must be considered when evaluating administrative procedures. These factors are: (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of that interest; and (3) the governmental interest, including the function involved and the fiscal and administrative burdens that other procedures would entail. Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).
 
 
 24
 We agree with Salazar that she had a substantial interest in receiving her full statutorily-allotted compensation for services actually rendered. However, in balancing the interests of the parties, the balance is heavily weighed in favor of the Department. The Department processes an enormous number of claims and must adopt realistic and practical auditing procedures. We agree with the district court's conclusion that, in view of the enormous logistical problems of Medicaid enforcement, statistical sampling is the only feasible method available. Accord, State of Georgia v. Califano, 446 F.Supp. 404 (N.D.Ga.1977).
 
 
 25
 Salazar has failed to show that the Department's procedures do not provide reasonable opportunity to rebut the Department's initial findings. First of all, it is difficult to understand how Salazar reads Rule 9.55 as stating that a hundred percent audit is the only means of rebutting the Department's presumption. Rule 9.55[5] clearly provides that the physician has the alternative of "present(ing) evidence to show that the sample used by the Department was invalid and, therefore, cannot be used to project the overpayments" (emphasis added) or conduct a one hundred percent audit of all medical records and presenting the results at a hearing. Thus, the physician has the option to present evidence deemed persuasive to rebut the finding of overpayments. A one hundred percent audit is not mandated.
 
 
 26
 Moreover, we find nothing improper with the Department's requirement that the physician, not the Department, conduct the one hundred percent audit. Assuming Salazar is correct in her assertion that a thorough knowledge of Department rules and regulations is necessary in order to conduct this audit, we do not believe it unreasonable to require a physician participating in publicly funded welfare programs to be thoroughly familiar with the Department's rules and regulations. Thorough knowledge is demanded on the part of the physician, not only for conducting an audit, but for submitting proper bills in the first place.
 
 
 27
 We have found no authority, nor has Salazar cited any, to support the contention that it is the state which must bear the cost of the audit. Obviously the cost of auditing physicians who voluntarily choose to participate in the Medicaid program must be borne by either the state or the physicians. We see nothing arbitrary or capricious about requiring physicians who are benefitting from the program to bear this burden, particularly when the state has already borne the cost of the initial audit and the evidence to rebut that initial determination is uniquely within the physician's control.
 
 III
 
 28
 Finally, we consider whether the district court properly entered a conditional order requiring Salazar to repay the Department the full amount of the recoupment claim when the complaint merely sought a declaratory judgment and injunctive relief and the Department did not counterclaim for enforcement of its administrative ruling. Salazar argues that the district court had no authority to enter the order against Salazar when the Department has not raised the issue of enforcement and no pleadings or motions requested this action.
 
 
 29
 Salazar's argument is not persuasive. The district court clearly had the authority to fully adjudicate the rights of all parties before it. Under the Declaratory Judgment Act, the court may grant all "necessary or proper relief." 28 U.S.C. § 2201. Under Fed.R.Civ.P. 54(c) the court may grant "the relief to which the party in whose favor ... (judgment) ... is rendered is entitled, even if the party has not demanded such a relief in his pleadings." By ordering Salazar to present evidence rebutting the Department's findings or pay the recoupment claim, the district court was merely awarding money damages. It is well-settled that the district court may grant monetary relief in declaratory judgment proceedings, even without a specific request. Freed v. Travelers, 300 F.2d 395 (7th Cir. 1962).
 
 
 30
 Accordingly, the decision of the district court is
 
 
 31
 AFFIRMED.
 
 
 
 *
 The Honorable Robert D. Morgan, Chief Judge of the United States District Court for the Central District of Illinois, is sitting by designation
 
 
 [1]
 The order was entered on December 17, 1980. The Department adopted rules conforming to the order on January 23, 1981
 
 
 [2]
 The calculations for computing a final recoupment claim are: 1) the overpayments in the audited sample are totaled; 2) this total is divided by the number of audited cases to get an average overpayment; and 3) this average overpayment is multiplied by the total number of cases for which the physician received Medicaid payments during an audit period to determine the total overpayment
 
 
 [3]
 The Department uses numerical codes to designate the various kinds of medical services for which the physician may be reimbursed. The code used in the billing form determines the amount paid to the physician. Use of an improper code can result in either an overpayment or an underpayment. However, while any overpayments resulting from an improper billing code are reflected in the final recoupment claim, no credit is given for an underpayment nor is the underpayment included in the extrapolation calculations to reduce the final recoupment claim
 
 
 [4]
 Irrebuttable presumptions involving cooperative state-federal Medicaid programs generally have been struck down. Rush v. Parham, 440 F.Supp. 383 (N.D.Ga.1977), reversed on other grounds, 625 F.2d 1150 (5th Cir.), reh. denied, 632 F.2d 894 (1980). In Rush the state plan irrebuttably denied Medicaid benefits for transsexual surgery despite the fact that this type of surgery involved procedures within the five categories of medical services which Title XIX mandates must be provided. The presumption that all transsexual surgery was medically unnecessary was deemed impermissible because it resulted in the categorical denial of benefits for services which the federal statute specifically required be provided without any evaluation of whether the treatment was warranted in a particular case. The court acknowledged, however, that the state was free to presume necessary and unnecessary medical procedures so long as it made provisions for and gave notice of the availability and procedure for rebutting the presumptions
 
 
 [5]
 Rule 9.55, in part, provides:
 (g) If the hearing is related to the Department's intent to recover money and the Department's recovery is based on sampling and extrapolation, the vendor may present evidence to show that the sample used by the Department was invalid and, therefore, cannot be used to project the overpayments identified in the sample to total billings for the audit period.
 The vendor may also conduct an audit of 100% of the medical records of payments received during the audit period and present the results of such an audit at the hearing. Any such audit should demonstrate that the vendor's records for the unaudited services provided during the audit period were in compliance with the regulations, provider handbooks and other written requirements of the Department. The vendor should be prepared to submit supporting documentation to demonstrate this compliance.