INDIANA STATE DEPARTMENT OF PUBLIC WELFARE and The State Board of Public Welfare, Appellants (Respondents Below),

v.

NUCLEOPATH, INC., Appellee (Petitioner Below).

No. 29A04–8805–CV–171.

Court of Appeals of Indiana, Fourth District.

April 17, 1989.

Linley E. Pearson, Atty. Gen., Gordon E. White, Jr., Deputy Atty. Gen., Indianapolis, for appellants.

Gerald G. Goldberg, Joseph P. O'Halloran, Widman, Goldberg & Zulkie, Ltd., Chicago, Daniel Evans, Brent D. Taylor, Baker & Daniels, Indianapolis, John S. Pearce, Pearce & Howard, Noblesville, for appellee.

CONOVER, Presiding Judge.

Appellant–Respondent Indiana State Department of Public Welfare and the State Board of Public Welfare (DPW) appeal the Hamilton Circuit Court's judgment reversing the State Board's determination Appellee–Petitioner Nucleopath, Inc. (Nucleopath) must repay DPW the sum of $275,312.36 and statutory interest because it had not documented certain laboratory services as required by the State Administrative Code.

We affirm.

This appeal presents one issue. Restated, it is whether St. Mary's Medical Center, Inc. (St. Mary's) laboratory records constitute sufficient documentation of the "hands off" aspect of Nucleopath's professional component billed to DPW for services to Medicaid patients.

Under a written agreement with St. Mary's, Nucleopath's physician-employees supervised St. Mary's laboratory facilities and its employees who processed various medical tests for the hospital's patients, including those on Medicaid. Both Nucleopath and St. Mary's are qualified recipients of Medicaid payments.

Under its contract with the hospital, the hospital originally billed its patients for Nucleopath's "professional component," but from 1983 on, Nucleopath itself billed the hospital's patients for the "professional component" involved in each laboratory test performed because the law changed. This professional component had two separate aspects, namely, "hands on" and "hands off." The hands on aspect was involved in a laboratory test whenever a Nucleopath physician-employee became physically involved with a laboratory test. The hands off aspect concerned Nucleopath's general supervision of St. Mary's laboratory and personnel.

Under the contract, as part of its professional duties regarding the hospital's laboratories and its personnel, Nucleopath was to (1) train, and (2) teach the hospital's laboratory personnel, (3) develop laboratory methodology, (4) set up laboratory tests, (5) develop quality control standards, (6) provide for laboratory maintenance, and (7) formulate laboratory policy. The intangible aspects of teaching, training, methodology, quality control, and formulation of laboratory policy, i.e., the hands off aspect of the professional component, were present in each laboratory test Nucleopath performed during this period, including those tests performed for Medicaid patients. Also under that contract, Nucleopath prepared and maintained the hospital's laboratory records as to each test performed in the hospital's laboratories.

The parties agree Nucleopath was entitled to bill for both the hands on and hands off aspects of the professional component involved in each laboratory test, including those tests made for Medicaid patients. Prior to October 1, 1983, St. Mary's billed for both the technical component, namely, the value of the services of its employees and the use of its machines, and Nucleopath's professional component, above-discussed. After that date, however, due to TEFRA law changes adopted by Medicaid, a "split bill" went into effect, i.e., the hospital thereafter billed its patients for the technical component and Nucleopath billed them for the professional component of each lab test. As both the hospital and Nucleopath were qualified to receive Medicaid payments, both billed DPW for their services to the hospital's Medicaid patients.

During a routine audit, the auditors discovered Nucleopath owned no separate records of its services rendered to Medicaid patients with special reference to the hands off aspect of its professional component, the only matter at issue in this appeal. (R. 232). In consequence, DPW sent Nucleopath a letter demanding repayment of

$275,312.36 it had paid Nucleopath during the period in question. Nucleopath, contesting DPW's claim for refund, instituted proceedings under the Administrative Adjudication Act.

The hearing officer determined St. Mary's laboratory records as prepared by Nucleopath constituted adequate independent documentation for Nucleopath's Medicaid billings for hands off professional services to Medicaid patients since those services were an inherent part of each hospital laboratory test. On appeal, the full DPW board reversed the hearing officer, and ordered DPW to seek reimbursement from Nucleopath. It then appealed to the Hamilton Circuit Court which, in turn, reversed the Board.

DPW appeals.

The simple question here is whether Nucleopath was required by the various Medicaid administrative rules and regulations to keep separate records verifying the hands off aspect of its professional component as to each lab test it performed for Medicaid patients, or whether Nucleopath may rely on the lab reports it prepared and maintained for St. Mary's as the documentation required by law and regulation to support its Medicaid billings.

DPW argues two federal and one state regulation requires Nucleopath to maintain separate records verifying its billings to Medicaid, namely, 42 U.S.C. 1396a(a)(27), 42 C.F.R. 431.107, and 470 IAC 5–5–1. 42 U.S.C. 1396a(a)(27) provides

> (27) provide for agreements with every person or institution services under the State plan under which such person or institution agrees (A) to keep such records as are necessary fully to disclose the extent of the services provided to individuals receiving assistance under the State plan, and (B) to furnish the State agency or the Secretary with such information, regarding any payments claimed by such person or institution for providing services under the State plan, as the State agency or the Secretary may from time to time request;

and 42 C.F.R. 431.107 reads

> (a) *Basis and purpose.* This section sets forth State plan requirements, based on sections 1902(a)(94) and 1902(a)(27) of the Act, that relate to the keeping of records and the furnishing of information by all providers of services (including individual practitioners and groups of practitioners).
>
> (b) *Agreements.* A State plan must provide for an agreement between the Medicaid agency and each provider furnishing services under the plan in which the provider agrees to:
>
> (1) Keep any records necessary to disclose the extent of services the provider furnishes to recipients;
>
> (2) On requests, furnish to the Medicaid agency, the Secretary, or the State Medicaid fraud control unit (if such a unit has been approved by the Secretary under Sec. 455.300 of this chapter), any information maintained under paragraph (b)(1) of this section and any information regarding payments claimed by the provider for furnishing services under the plan; and
>
> (3) Comply with the disclosure requirements specified in Part 455, Subpart B of this chapter.

The State provision, 470 IAC 5–5–1 says

> SEC. 1. *All providers* participating within the Indiana Medicaid Program shall *maintain,* for a period of three (3) years from the date Medicaid services are provided, such medical and/or other records, including x-rays, *as are necessary to fully disclose and document the extent of services provided* to individuals receiving assistance under the provisions of the Indiana Medicaid Program ... Such medical and/or other *records shall include,* at the minimum, the following information and documentation:
>
> a. Identity of the individual to whom service was rendered;
>
> b. Identity of the provider rendering said service;
>
> c. Identity, and position, of provider employee rendering said service, if applicable;
>
> d. Date on which said service was rendered;

e. Diagnosis of medical condition of the individual to whom service was rendered, relevant to physicians and dentists only;

f. Detailed statement describing services rendered;

g. Location at which services were rendered; and

h. Amount claimed through the Indiana Medicaid Program for each specific service rendered. (Emphasis supplied).

Our standard of review in administrative appeals is well known and oft stated. Our review is limited to a determination of whether the agency's determination is arbitrary, capricious or unsupported by substantial evidence. *Petition of McDonald* (1961), 241 Ind. 239, 171 N.E.2d 691, 692–693; *St. Mary's Medical Center of Evansville, Inc. v. County Dept. of Public Welfare of Gibson County* (1986), Ind.App., 495 N.E.2d 773, 774–775. As Judge Neal cogently observed:

Our review of an administrative order or decision is limited to consideration of whether the agency possessed jurisdiction over the matter decided, and whether the order was made in conformity with proper legal procedure, was based on substantial evidence, and does not violate any constitutional, statutory or legal principle. Courts have no authority to usurp or exercise the functions delegated to such agencies. *Bolerjack v. Forsythe* (1984), Ind.App., 461 N.E.2d 1126, *trans. denied.*

*Young v. Williamson* (1986), Ind.App., 497 N.E.2d 612, 616.

The Board's resolution of December 16, 1986, reads as follows:

"RESOLVED, That the Hearing Officer's recommendation not be adopted as to Finding of Fact No. 5 and in lieu thereof the following finding of fact is hereby adopted:

That Nucleopath, Inc. maintained no documentation for certain services it rendered to Medicaid patients as it is required by law to maintain."

"RESOLVED, That the Hearing Officer's Recommendation not be adopted as

to the conclusion stated therein and that the following conclusion of law is hereby adopted in lieu thereof:

That the law requires all providers of Medicaid services to maintain documentation for the services which providers render. Said documentation must evidence, at a minimum, the extent of the services that the provider renders."

"RESOLVED, That the Indiana State Department of Public Welfare is directed to collect from Nucleopath, Inc., the sum of $275,312.36 along with statutory interest."

After an extensive review, we agree with the trial court: the DPW Board's action was not based upon substantial evidence.

It is eminently clear the purpose of the stringent Medicaid record keeping requirements is to detect cases where Medicaid payments to providers are fraudulently obtained because no services to Medicaid patients were, in fact, performed by the provider-recipient. It is also eminently clear in this case DPW is not pursuing Nucleopath, Dr. Mason, or any of Nucleopath's employee-physicians for fraudulent receipt of Medicaid funds. Even with that given, however, DPW argues the applicable regulations require Nucleopath to maintain its own private records as to the hands off aspect of its professional component as to each lab test performed. Because it has not, DPW posits, Nucleopath must repay over a quarter million dollars of Medicaid funds for which it billed and was paid. Nucleopath argues to the contrary.

Based upon the evidence before him, the hearing officer initially determined Nucleopath's professional component is an inherent part of every lab test, just as is the hospital's technical component. As one witness noted, "You can't have one without the other." This court adds, "You wouldn't want one without the other." Absent the training and teaching of laboratory personnel, establishment of recognized methodology, quality control of lab tests, etc. by qualified experts—the intangible ingredients of the hands off aspect of Nucleopath's professional component—the

lab tests performed would be nothing more than an insidious, crawling, and dank invitation to medical disaster. Thus, Medicaid has no objection to paying the professional component to qualified pathologists who supervise hospital laboratories. However, such obvious logic does not get to the heart of this appeal, or the question here involved.

From our extensive review of the record we believe it clear the hearing officer correctly determined Nucleopath can rely upon St. Mary's lab records as documentation for the hands off aspect of its professional component because it is inherently present in every laboratory test whether or not any hands on aspect is. Thus, the documentation required by the Medicaid-related federal and state regulations is here present, and no cause exists for exacting repayment of the $275,312.36 and interest thereon DPW here pursues.

As authority for its position Nucleopath may not rely upon St. Mary's lab records, DPW relies chiefly upon three cases, *Daviess County Hospital v. Bowen* (C.A.7, 1987) 811 F.2d 338; *Illinois Physicians Union v. Miller* (C.A. 7, 1982) 675 F.2d 151; and *Carbondale Nursing Home v. Commonwealth of Penna. DPW* (1988), 120 Pa. Cmwlth. 186, 548 A.2d 376. Each is distinguishable on its facts, but the law of each supports the decision we here reach.

We perceive the learning of these cases to be as follows: The law and regulations regarding Medicaid do not require total documentation, only financial records and statistical data capable of being audited is required. *Carbondale Nursing Home*, 548 A.2d at 378-9 (mere testimony of owners as to duties and estimates of time spent in recognized management functions insufficient documentation in Medicaid cases). Discrepancies exist when no medical records are available to verify the submitted bills. *Illinois Physicians Union*, 675 F.2d at 153 (physician billed when (1) no medical charts were available, (2) charts did not reflect services on days for which service billed, (3) bills did not accurately reflect services rendered, and (4) physician billed for service rendered by others). In Medicare cases, estimates of physical therapy hours worked are insufficient to reflect the reasonable costs, i.e. "actual costs incurred" for physical therapy work on Medicare patients. Data provided must provide an accurate audit trail. *Daviess County Hospital*, 811 F.2d at 344 (hospital estimated hours worked by physical therapists per Medicare patient, insufficient documentation).

This precedent does not support reversal of the trial court in this case because

(a) medical records maintained by Nucleopath for the hospital are sufficient to support a reasonable audit trail,

(b) they are current and reflect each element to be shown as required by 470 IAC 5-5-1(a) through (g), and

(c) the costs for the hands off aspect of Nucleopath's professional component are inherently included in such records, in satisfaction of 470 IAC 5-5-1(h), if reasonable auditing procedures are adopted and used by DPW in this case.

470 IAC 5-5-1 does not require either (a) absolute documentation, or (b) ownership of supporting medical records. It only requires participating providers to "maintain" such medical records "as are necessary to fully disclose and document the extent of services provided[.]" It is patent upon examination of the records available to DPW in this instance, St. Mary's records fully meet that criteria. Such records sufficiently provide the "reasonable audit trail" required by the law and regulations relating to Medicaid, as the trial court and hearing officer correctly determined. For those reasons DPW is not entitled to pursue Nucleopath for the repayment it seeks.

Affirmed.

MILLER, J., concurs.

SHIELDS, P.J., concurs in result with separate opinion.

SHIELDS, Presiding Judge, concurring.

I concur in result.

Nucleopath, Inc. is under contract with St. Mary's Medical Center, Inc. (Hospital)

to direct, conduct and administer the personnel and equipment which comprise the Hospital's Department of Pathology and Nuclear Medicine. Nucleopath's services are paid for by the individual recipient of the services, *i.e.*, the patient. In some cases, the Hospital bills the patient for Nucleopath's services and forwards payment to Nucleopath. Where the patient is a recipient of Medicaid benefits, Nucleopath bills and receives payment from the Department of Public Welfare (Department). As stated in the majority opinion, Nucleopath's services are denominated as the professional component. In all situations, the professional component consists of Nucleopath's services in teaching, training, preparing methodology, maintaining quality control and formulating policy for the Hospital personnel it supervises, controls and administers. In some situations, the professional component also includes analysis by a Nucleopath physician. Thus, the charge for the professional component includes, in all situations, Nucleopath's training, teaching, methodology, quality control and policy services; where a Nucleopath physician also performs an analysis, an additional charge for that service is included.

In all situations, the end result of Nucleopath's professional component services is a laboratory report which is made on paper bearing the name of the Hospital which, after all, owns the laboratory facility. The laboratory report is permanently filed with that patient's medical records maintained at the Hospital.

The instant dispute involves Nucleopath's compensation for its basic professional component, *i.e.*, its services for laboratory tests which do not involve any analysis by a Nucleopath physician. Department argues the laboratory report under the Hospital's name, and in the Hospital's medical records library, as a matter of law, cannot constitute documentation of Nucleopath's professional component services. Department's position is that Nucleopath must keep independent documentation.

All parties agree that the compensability of the professional component is not an issue in this particular case. Neither is the adequacy of the laboratory report to document the professional component an issue. Rather, the very limited issue here is whether the laboratory report, on a paper bearing the Hospital name, and delivered to and stored by the Hospital, satisfies Nucleopath's admitted duty to "maintain such records ... as are necessary to fully disclose and document the extent of the services [Nucleopath] provided" to Medicaid recipients. Again, I emphasize the *adequacy* of the laboratory report to document the professional component is not an issue; only the "maintenance" of the record is in dispute.

The issue, then, is one of law: the meaning of the phrase "provider ... shall maintain." The dictionary definition of maintain includes: "to keep in a state of repair, efficiency, or validity: preserve from failure or decline ..." *Webster's Third New International Dictionary* 1362 (1976). Otherwise stated, an object is maintained if it is preserved in its existing usable state. This definition fulfills the intent of the duty to maintain which is to provide a mechanism "to enable the Department to monitor the operation of the aid program and thereby seek to maintain its integrity, rather than to detect and administer sanctions for fraud or criminal acts." *Boffa v. Illinois Department of Public Aid* (1988), 168 Ill. App.3d 139, 118 Ill.Dec. 974, 978, 522 N.E. 2d 644, 648.

Considering this purpose, it is my opinion that a reasonable interpretation of the duty imposed upon a Medicaid provider is to insure the preservation of the records which document its services in a form that is accessible, useable, and meaningful to the provider and Department. If this purpose is met, the location of the depository is of no consequence. In this case, the adequacy of the depository, the medical records library of the Hospital, is not an issue. Further, here the format of the particular document, *i.e.*, the laboratory report, is irrelevant because whether (1) the disputed charge relates to a professional component provided in the Hospital's labo-

ratory by the provider, Nucleopath, and (2) whether the professional component is compensable, is not in issue.

I, therefore, concur with the result reached by the majority for the simple reason that, as a matter of law, the laboratory reports were maintained by Nucleopath when the patient's records were permanently filed in Hospital's medical library.